### THE RICHARD J. CARNEY.

#### STOUT v. THE RICHARD J. CARNEY et al.

(Circuit Court of Appeals, Seventh Circuit. January 16, 1893.)

#### No. 35.

1. CHATTEL MORTGAGES—BONA FIDE PURCHASER—NOTICE—BURDEN OF PROOF.
   On a question as to whether the purchaser of a vessel took the same without notice of a prior unrecorded chattel mortgage, the fact that the mortgagee failed to record his mortgage places the burden of proof upon him.

2. SAME—EVIDENCE.
   On a question as to whether libelant, in buying a vessel, took the same as a bona fide purchaser without notice of a prior unrecorded chattel mortgage given by his vendor, it appeared that libelant and his vendor had offices together; that libelant was present when his vendor purchased the vessel and gave the mortgage in question to secure a balance of purchase money; and the mortgagee testified that libelant then had knowledge of the whole transaction. It further appeared that libelant took the vessel in consideration of a pre-existing indebtedness, only three days before his vendor made an assignment, and did not record his bills of sale until the day thereafter; that some time afterwards the mortgagee took possession of the vessel; that he subsequently met libelant, who expressed no surprise at the existence of his claim, and an arrangement was then entered into between them whereby libelant paid a large amount of insurance upon

the vessel for the benefit of the mortgagee, and also indorsed the first of the notes secured by the mortgage, whereupon the mortgagee surrendered possession of the vessel; that the mortgagor always retained the management of the vessel, together with another vessel mortgaged at the same time and under the same circumstances, and also purchased by libelant before the assignment; that this other vessel was sold under the mortgage, and the surplus proceeds turned over to the mortgagor, and not to libelant; that prior to this time an attempt was made to sell the vessel to third parties, and the latter testified that libelant then told them of the existence of the mortgage, and that they were only to pay him the value of the vessel in excess thereof. *Held,* upon these facts, and upon all the evidence, that libelant was not a bona fide purchaser, and that the mortgage was entitled to priority over his claim.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

In Admiralty. Libel by James C. Stout against the schooner Richard J. Carney and against James Davidson, mortgagee thereof, to recover possession. In the district court a decree was rendered in favor of the libelant, but on appeal by defendant Davidson to the circuit court this decree was reversed. Libelant thereupon appealed to this court. Affirmed.

Robert Rae, for appellant, J. C. Stout.
John C. Richberg, for appellee, James Davidson.

Before WOODS, Circuit Judge, and JENKINS and BUNN, District Judges.

BUNN, District Judge. This is a libel in admiralty for possession. The libelant, James C. Stout, claims to be the owner of the schooner Richard J. Carney by purchase from John A. Maxwell, of St. Paul, on the 20th of October, 1887. The schooner was enrolled at the port of St. Paul, that being her home port. The respondent James Davidson, who is a ship owner and builder residing at Bay City, Mich., and who had possession under a mortgage at the time the schooner was libeled, claims as mortgagee under said mortgage given him by Maxwell on a sale of the schooner by said Davidson to Maxwell on April 16, 1887, to secure a portion of the purchase price. This mortgage was not recorded until November 10, 1887, and after the sale of the vessel to the libelant. After the seizure of the schooner in this case, she was libeled and sold for seamen's wages for the sum of $4,300, and the proceeds paid into court. Davidson, as mortgagee, then intervened, as against the balance of the proceeds after the payment of seamen's wages, and also in this case appears and answers the libel claiming the balance of the proceeds. So that the only question in the case is as to who is entitled to the money arising from the sale, as between the libelant, claiming as purchaser from Maxwell, and Davidson, claiming under an unrecorded prior mortgage for the purchase money on a sale to Maxwell.

The only issue in this case is one of fact. Did Stout have actual notice of the $7,250 notes and mortgage given by Rood & Maxwell on April 16, 1887, to James Davidson on the boat Carney, to secure the balance of purchase price on sale of the boat? The price of the boat was $9,750,—$2,500 paid down, and the balance secured by

mortgage on the Carney. In order to determine the fact, recourse must be had to all the evidence and circumstances. There was a good deal of intercourse between the parties, and the entire transactions as shown, as well by the documentary evidence and conduct of the parties at the time as their oral statements under oath given since the dispute arose, are to be fully considered.

The burden is upon the mortgagee, inasmuch as he failed to record his mortgage, to show that Stout, at the time he purchased, had notice of his mortgage, and therefore purchased subject to it. Davidson says Stout, as well as Maxwell, was in Chicago at the hotel at the time of the sale of the vessel from Davidson to Maxwell, and knew all about it. Stout admits being there, and that he knew of the sale, but denies that he knew about the mortgage being given back to secure purchase money. The evidence of the parties being in direct conflict, it becomes essential to look into the record of the entire deal, and all the circumstances, to see who is best corroborated upon the one issue.

In looking into the record evidence, it seems to me beyond question, taking all the testimony together, that Stout was not by any means a bona fide purchaser, but that, on the contrary, he bought subject to, and with full knowledge of, Davidson's mortgage. He officed with Maxwell at St. Paul, and from the evidence it is quite clear he was acting rather as Maxwell's friend and confidant than as a purchaser of the vessel in good faith to pay a pre-existing debt. If the purchase was a bona fide one, for a debt already existing for advance of money, it seems rather strange no evidence was introduced of the acceptances taken up by Stout for Maxwell. The checks given might be for that, or for anything else. It is true Stout had the undoubted right to rest this part of his case upon his and Maxwell's testimony; but it certainly would have been more satisfactory if further proof had been offered upon this point. But supposing Stout to be a bona fide purchaser, and that he took the vessel in payment and discharge of pre-existing debts due him from Maxwell, I am satisfied from all the testimony, and especially from the record and documentary proofs and from the conduct of both parties, that Stout took with notice of the unrecorded mortgage of Davidson, and subject to it. It seems clear from all the circumstances that Maxwell did not deceive Stout in the sale, but, on the contrary, that they acted together, and that whatever Maxwell knew, Stout knew. The evidence is strong that the sale was only colorable; that Maxwell, being already insolvent and in a failing condition, Stout stepped in as a friend and confidant to help him out. Maxwell knew on October 22, 1887, that his property was to be attached by his creditors at St. Paul. October 24th, at Bayfield, he made an assignment. Stout claims that he bought the two boats on October 20th, to pay an existent indebtedness. But he did not record his bills of sale until the 25th. Why not, unless there was some hope that Maxwell might pull through? If a bona fide sale, why not record them on the 20th? If his purpose had been to secure to himself a bona fide debt, without any thought as to whether the recording of the bills of sale would embarrass Maxwell in fixing up

with his creditors, it is difficult to see why he should not have recorded them on the 20th. He heard, about 5 o'clock on the 24th, of Maxwell's assignment at Bayfield, and on the next day recorded his bills of sale. Then, I think, beyond much doubt, that Stout's conduct at St. Paul in November, 1887, when Davidson and Bruce met him there, after Davidson had taken possession of the Carney under the mortgage, is quite inconsistent with the idea of his being a bona fide purchaser of the boat without notice of the mortgage. Indeed, the conduct of both parties and of Maxwell on this occasion is very important and instructive, and is just such as we might expect it to be if Stout had full knowledge all the time of Davidson's mortgage. Stout makes no claim on that occasion of anything to the contrary, and expresses no surprise at learning the fact that Davidson had so large a claim on the vessel, almost equal to its full value. According to the testimony of Bruce, everything was amicably and satisfactorily arranged, and it is quite evident that it was arranged on the basis of Davidson having this mortgage as a lien on the boat. Why else should Stout pay the $676 insurance money for the benefit of the mortgagee, and indorse the first mortgage note of $1,250? Why else should Davidson, having possession of the vessel, give up possession to Stout and Maxwell, they taking the freight upon Stout's indorsing one of the mortgage notes, and paying the insurance for the benefit of the mortgagee? Such facts speak louder than mere words spoken, although under oath, long after the transaction, and after a controversy has arisen in regard to the proceeds of the sale of the vessel.

If Stout had bought without notice of Maxwell's claim, there was no occasion for his either indorsing any of the notes or paying any insurance for Davidson. He would have said:

"No. This vessel is mine. I bought it without knowledge of your unrecorded mortgage. I cannot indorse or pay any of your notes, and what insurance I pay will be to protect my own interest."

If he bought subject to the mortgage, he was still under no obligations to become personally liable on Maxwell's notes to Davidson, nor to get insurance on Davidson's interest for Davidson's benefit; but it is evident that, if such were the fact, it would constitute a sufficient inducement for Stout to gain possession of the boat by indorsing one of the notes and paying the insurance money. But upon the contrary hypothesis,—that he was a bona fide purchaser without notice of Davidson's claim,—it is difficult to account either for his conduct in indorsing the note and paying the insurance, or for Davidson's conduct in giving up possession of the vessel. On that hypothesis the conduct of Davidson, who, it seems, is a man of business, in giving over the vessel and freight to Stout, is wholly unaccountable. Under any such circumstances, Davidson would have said:

"I have the possession under my mortgage, which takes nearly or quite the entire interest in the boat. If you dispute my title to receive this money, now and here is the place to try this question. I will proceed to foreclose."

Instead of that, Davidson gives over possession. Stout pays $576 insurance for his benefit under the mortgage, and actually agrees in

writing to pay, and afterwards does pay, one of the mortgage notes. Davidson says he promised orally to pay the others as they fell due. This Stout denies. But he cannot dispute the record and documentary proofs, so far as they go. He cannot deny that he paid the insurance money for the benefit of the mortgagee, or that he indorsed and actually paid the mortgage note of $1,250 first to fall due.

Then it is in evidence that, though Stout purchased both these boats, the Carney and the Oneida, Maxwell retained the control and management (Bruce says, under a power of attorney from Stout) until they were sold under the mortgage; and when the Oneida was finally disposed of, and it appeared there was an equity remaining above the mortgage and other claims of $2,300, the evidence shows that was paid to Maxwell. There was a balance of $2,500 belonging to the owner of the equity in that boat, and the evidence shows that Bruce was paid $200 out of that for his commission on the sale, and the note for the remaining $2,300 was handed to Maxwell. The note was made by the purchasers, R. N. Bump, Mr. Bradley, and J. Davidson, Jr., to the order of J. C. Rykert, and by him indorsed and given to Maxwell, though Maxwell and Stout were both present. This circumstance seems quite significant. If Stout was the real owner, it would seem that the equity above the claims against the boat should have gone to him. Maxwell afterwards sold the note, and got the money.

There is enough in the case, without the subsequent testimony of the two O'Days, to satisfy the court; but their testimony, and the notes and mortgages introduced in connection therewith, go to confirm the previous case in favor of Davidson and against Stout. This testimony was taken on January 2, 1891, on the hearing in the circuit court, on an appeal from the judgment of the district court. Patrick O'Day testifies that he had negotiations with Maxwell in 1887 and 1888, in regard to purchasing the barge Carney and the propeller Oneida; that, while at Chicago, Maxwell telegraphed to Stout to come there, and Stout came; that was the first time he had ever seen Stout. That on May 9, 1888, he purchased both these boats. That he was to give Stout $1,500 for his interest in the Carney, and that was all he (Stout) owned in her; that Stout stated that there was an incumbrance on her of $4,500, due to James Davidson, and that, for Stout's title to the vessel, Stout wanted $1,500; that this $1,500 was to be secured by three notes of $500 each, and a mortgage on the Carney. These three notes and the mortgage were produced in evidence, and tally with O'Day's statement. The notes bear date May 9, 1888, and are signed by the two O'Days. O'Day testifies that they are all, as well as the mortgage, in Stout's handwriting, and that Stout wrote them; that they were made out in Chicago, at the Grace Hotel. He says that, after the notes and mortgage were made out, Maxwell went with him to Buffalo to see some property the O'Days were to give as security for the boat Oneida. O'Day says Maxwell told him he was acting in his own interest; that Stout was his friend, and wanted to help him out. Patrick O'Day is corroborated in all his statements by his son P. J. O'Day. They both testify that, before the papers were passed, Patrick O'Day telegraphed to

Mr. Davidson to find out if he could have an extension of time on the mortgage notes, and that Davidson telegraphed back that he had to have his money, and that, when they saw that they could not handle that, that broke up the trade. The credit of the O'Days is attacked by Stout, from which it appears they are not altogether what they should be; but in this matter it would seem they are pretty strongly corroborated, not only by the notes and mortgage made contemporaneously with that sale, or attempted sale, but by the conduct of Maxwell and Stout all the way through, and by the testimony of Bruce. Bruce testifies that, "if the two boats had been sold to the O'Days, Stout would have got five or six thousand dollars,— six thousand dollars easy;" and this corroborates the testimony of the O'Days that Stout was to get $1,500 out of the Carney, being the value of his equity over the Davidson mortgage, and $4,000 for the Oneida, making $5,500 for his interest in the two boats. The circumstances in the case all conduct to the same conclusion,—that Stout and Maxwell were acting together, and that Stout's purchase was made with full knowledge of Davidson's mortgage. The effort seemed to be to save something out of these two boats over and above the liens against them. There is nothing in the record to show that Stout ever claimed to be an innocent purchaser without notice until the next month after the trade with the O'Days fell through, and after Davidson had foreclosed his mortgage, in June, 1888. Then Stout, in a letter dated June 13, 1888, repudiated the Davidson mortgage as not binding on him, and then Maxwell comes in and claims, for the first time, that he has deceived Stout. Stout was a real-estate and loan agent, and might very well have been deceived in a matter so much out of his line; but the circumstances and evidence show that he was not deceived. Even after Davidson had commenced foreclosure, Stout took steps to defend his interests. On May 15th, Bruce wrote a letter to Davidson, at Maxwell's request, asking Davidson to extend the time on the mortgage. No doubt, if Davidson had consented to extend the time, and given Maxwell further opportunity to sell, subject to Davidson's mortgage, the claim soon after put forth, that Stout had purchased without notice, would also have been postponed; but when Davidson would not extend, but insisted upon foreclosing, this claim was put forward. When Davidson, on June 9th, took possession, Stout does nothing, but Maxwell still acts in all respects as the owner, and writes a coaxing and threatening letter to Davidson. He then puts forth the threat that, unless Davidson will release the boat, Stout will replevy, but that, if Davidson would do as Maxwell wanted him to do, he would get all his money. He says: "Don't jump on me because I am down. I have always treated you fairly, and I want you to reciprocate." I think, on the whole, that the record evidence, and the conduct of the parties all the way through, fully corroborate the testimony of Davidson that Stout knew all about the transaction of the sale of the boats and the taking a mortgage back, and that he purchased with such knowledge, and, further, that his purchase of the Carney was but colorable, and not made in good faith.

The finding and decree of the circuit court are affirmed.